IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MDADVANTAGE INSURANCE COMPANY OF NEW JERSEY, *Plaintiff*, | : : : : : : : : | CIVIL ACTION NO. 16-969 |
| v. | | |
| AARON S. HASIUK, M.D., et al., *Defendants*. | | |

**MEMORANDUM**

**JONES, II J.**                                                                                               **March 31, 2020**

      MDAdvantage Insurance Company of New Jersey ("Plaintiff"), filed the instant Motion for Summary Judgement pursuant to Fed. R. Civ. P. 56(a), seeking a ruling that it is entitled to rescind the medical malpractice insurance policies it issued to Aaron S. Hasiuk, M.D., and his solo-owned corporation, Bucks County Women's Healthcare (collectively, "BCWH Defendants"), as a matter of law. (ECF No. 91.) The BCWH Defendants, as well as separate Defendants Ruth Bardsley and Chee Chee Sisco, filed responses in opposition to Plaintiff's Motion. (ECF Nos. 93, 95, 97.) Plaintiff was granted leave by the Court to file a reply in further support of its motion, and Plaintiff's Reply was docketed on July 19, 2019. (ECF No. 102.) After thorough consideration of the arguments raised by the parties, and the facts and evidence of record, the Court finds that Plaintiff has not met its burden of establishing the absence of a genuine dispute of material fact in this case, and that Plaintiff's Motion must therefore be denied.

**I.    BACKGROUND**

      The following factual background is gleaned from the Plaintiff's Statement of Undisputed Material Facts ("Pl.'s SUMF") (ECF No. 91-1), the BCWH Defendants' response thereto (ECF No. 93), and the other facts and evidence of record:

In November 2015, the BCWH Defendants "filed an application with [Plaintiff] for claims-made Professional Liability Insurance for the period from January 1, 2016 through January 1, 2017, and in early December filed an application with [Plaintiff] for 'prior acts' coverage, which would provide [them] with retroactive coverage for acts dating back to July 1, 2004." (Pl.'s SUMF at ¶ 2.) The initial application included the following question: "Are you aware of any medical incidents, adverse outcomes or other circumstances that you expect to give rise to a claim in the future?" (*Id.* at ¶ 3.). To that question, Defendants responded "no." (*Id.*) The supplemental application asked: "Do you know of any pending claims, incidents or activities, including any request for patient records that might give rise to any claim in the future?" (*Id.* at ¶ 5.) Defendants again responded "no." (*Id.*) After receiving the applications, Plaintiff issued the requested insurance policies to the BCWH Defendants. (*Id.* at ¶¶ 7–8.)

On December 29, 2015, one of Dr. Hasiuk's patients, Ruth Bardsley, filed a lawsuit against him for medical malpractice stemming from a "mini-laparatomy and bilateral salpingo-oopherectomy." (*Id.* at ¶¶ 9–10.) Shortly after the procedure performed by Dr. Hasiuk, Ms. Bardsley "required emergency surgery to repair her bowel, and to perform a colostomy"; she "remained hospitalized for another 18 days because, *inter alia*, she developed septic shock, which required her to spend time in the hospital's Intensive Care Unit." (*Id.* at ¶¶ 13–14.) In June 2016, Dr. Hasiuk was sued by another patient, Chee Chee Sisco, "in connection with her pregnancy and the delivery of her minor child, . . . which allegedly involved a birth injury due to severe fetal distress and placental abruption." (*Id.* at ¶¶ 15–17.) Dr. Hasiuk sought insurance coverage from Plaintiff in connection with both lawsuits. (*Id.* at ¶ 18.)

After Dr. Hasiuk filed his insurance claim for coverage in connection with Ms. Bardsley's lawsuit—but before Ms. Sisco commenced her suit—Margaret Chipowsky, a claims

specialist employed by Plaintiff, contacted Dr. Hasiuk to interview him regarding Ms. Bardsley's claims. (*Id.* at ¶¶ 31–33.) Ms. Chipowsky memorialized her conversation with Dr. Hasiuk in a memorandum, which she sent to the BCWH Defendants via email and certified mail, requesting that they let her know of any inaccuracies contained therein. (*Id.* at ¶¶ 34–37.) The BCWH Defendants responded to Ms. Chipowsky via email, noting several inaccuracies in her memorandum. (*See* ECF No. 91-5 at 19.)

It is undisputed that between December 2014 and April 2015, three separate requests for Ms. Bardsley's medical records were sent to the BCWH Defendants, as well as a follow-up request, by two different law firms. (Pl.'s SUMF at ¶¶ 21–27.) The HIPAA authorization forms attached to two of the requests indicated that their purpose was "Civil Litigation." Similarly, the HIPAA authorization form attached to the other request contained a "check-mark" in the box titled "legal"; however, it appears as though the requests from that law firm were subsequently cancelled. (*See* ECF No. 96-3.) In addition, the BCWH Defendants received a request for Ms. Sisco's records in June 2015. (Pl.'s SUMF at ¶ 28.) The HIPAA authorization form attached to that request stated that the purpose of the request was "litigation." (*Id.* at ¶ 29.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires a court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it might affect the outcome of the suit under the governing substantive law." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). "The moving party bears the burden of

identifying specific portions of the record that establish the absence of a genuine issue of material fact." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015). "In addition, a court should view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor." *Scheidemantle*, 470 F.3d at 538. "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini*, 795 F.3d at 416 (internal quotation marks omitted). The "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* (internal quotation marks omitted).

### III. DISCUSSION

Plaintiff's Motion seeks to void the insurance agreement between it and the BCWH Defendants based on its claim that Defendants made certain misrepresentations in their insurance application forms. Under Pennsylvania law, "an insurance policy is void *ab initio* for misrepresentation when the insurer can establish that (1) the representation was false, (2) the insured knew it to be false when made or acted in bad faith, and (3) the representation was material to the risk being insured." *Westport Ins. Corp. v. Hippo Fleming & Pertile Law Offices*, 349 F. Supp. 3d 468, 483 (W.D. Pa. 2018).

Plaintiff makes four arguments in support of its claim that the BCWH Defendants made knowingly false representations in the insurance applications. First, Plaintiff argues that Defendants must have known of the coming lawsuits since four requests for Ms. Bardsley's medical records were sent to BCWH between December 2014 and April 2015, and a request for Ms. Sisco's medical records was sent to BCWH on June 18, 2015—"all of which indicated that the requests were for legal purposes or litigation." Pl.'s Br. at 13. As noted above, the relevant

4

questions in the application and supplemental application asked, respectively: (i) whether the applicant was "aware of any medical incidents, adverse outcomes or other circumstances that you expect to give rise to a claim in the future"; and (ii) whether the applicant knew "of any pending claims, incidents or activities, including any request for patient records that might give rise to any claim in the future." Pl.'s Br. at 3–4.

It appears to the Court that the first question clearly solicits the applicant's subjective opinion, in that it asks if anything has happened that the applicant "*expect[s] to* give rise to a claim in the future." *Id.* at 3 (emphasis added). Plaintiff has not met its burden of demonstrating that Defendants' answer to this question was knowingly false. While Plaintiff has established that BCWH received requests for the records of Ms. Bardsley and Ms. Sisco, it has not established that the receipt of those requests caused Defendants to "expect" a claim to be filed; the testimony of record indicates just the opposite. Dr. Hasiuk testified that he did not see the requests for Ms. Bardsley's records before her lawsuit was commenced, and that even "if he had seen the records request with respect to Ms. Sisco, it would not have concerned him because he did not believe a lawsuit was possible because of the care that he had given Ms. Sisco in saving [her] baby's life." Defs.' Resp. Br. at 3–4. Ms. Gabrieli, who "handles the record[] request[s] in Dr. Hasiuk's office," testified that she was "not concerned after receiving records requests for Ms. Bardsley because," according to her, "Dr. Hasiuk did his follow up and Ms. Bardsley was fine." *Id.* at 3. Ms. Gabrieli "also testified that while she had received a records request for Ms. Sisco, Ms. Gabrieli was surprised that a lawsuit was filed because it was Ms. Gabrieli's understanding that Dr. Hasiuk had saved Ms. Sisco's baby's life." *Id.* at 4.

It is not as obvious that the question in the supplemental application similarly seeks the applicant's subjective opinion regarding the likelihood of a future lawsuit. That question asks

5

about anything "that *might* give rise" to a future claim—"including any request for patient records"—as opposed to anything the applicant "*expect[s] to* give rise" to a future claim. *Id.* at 3–4 (emphasis added). However, it is certainly reasonable to interpret the question as asking whether anything has occurred that the applicant *thinks* might give rise to a future claim. And as discussed above, the evidence of record does not establish that receipt of the record requests caused Defendants to anticipate future lawsuits. This interpretation of the question is bolstered by the fact that, if Plaintiff were actually asking the applicant to disclose any and all requests for patient records it had received, Plaintiff could have simply phrased the question that way. Moreover, Plaintiff has not established that receiving any request for a patient's records should lead a medical practitioner to presume that a lawsuit is likely to follow; again, Defendants point out that the evidence of record demonstrates just the opposite. *See* Defs.' Resp. Br. at 4; Hasiuk 6/29/2018 Dep. Tr. at 112:18–21 ("And as I've stated before, when somebody asks for records, that usually doesn't go anywhere so I don't pay attention to it."). Accordingly, the existence of the patient record requests does not resolve the core factual dispute in this case, i.e., the BCWH Defendants' state of mind when answering the application questions at issue.

Plaintiff's second argument in support of its request for summary judgment is that the memorandum prepared by its claims specialist, Ms. Chipowsky, establishes that Dr. Hasiuk anticipated being sued by Ms. Bardsley. As discussed above, Ms. Chipowsky drafted the memorandum to memorialize her January 29, 2016 conversation with Dr. Hasiuk regarding Ms. Bardsley's lawsuit. Plaintiff's argument is based on the following sentence from the memorandum: "I asked him, 'after receiving the [records] request from an attorney, did you think the patient was going to sue you?' and he replied, 'of course.'" ECF No. 91-5 at 22. Plaintiff also relies on the fact that Ms. Chipowsky emailed the memorandum to Dr. Hasiuk

requesting that he let her know of any inaccuracies contained therein, and that Defendants' response made certain corrections, but none to the above-quoted sentence. However, the veracity of the memorandum is disputed by Defendants, and the memorandum itself also states that Dr. Hasiuk said he "'really thought [Ms. Bardsley] *wasn't* going to sue' [him] during [her] hospitalization." ECF No. 91-5 at 21 (emphasis added).

While it could be argued that the conflicting statements as to Dr. Hasiuk's state of mind regarding a potential suit by Ms. Bardsley can be reconciled by the temporal distinction between what he thought "during [Ms. Bardsley's] hospitalization" and "after receiving the [records] request from an attorney," the testimony of record contradicts such an interpretation, as Dr. Hasiuk testified that he never saw the requests for Ms. Bardsley's records. *See* Defs.' Resp. Br. at 3. Ms. Gabrieli's deposition testimony is somewhat contradictory, as she stated that she "probably" showed the second request for Ms. Bardsley's records to Dr. Hasiuk, but she also said that Dr. Hasiuk "wasn't concerned about it because [] he did his follow-up and everything was fine, [Ms. Bardsley] was fine." Gabrieli 10/3/2018 Dep. Tr. at 52:5–24. *See also id.* at 96:4–5 (stating that when Dr. Hasiuk first saw the Bardsley complaint: "He was totally shocked. Never expected it.").[1] Moreover, when asked what he remembered about his conversation with Ms. Chipowsky, Dr. Hasiuk said he "remember[ed] telling her [he] didn't think [Ms. Bardsley] was going to sue" him. Hasiuk 6/29/2018 Dep. Tr. at 131:16–20. Accordingly, Ms.

---

[1] Plaintiff argues in its reply brief that one of Defendants' corrections to Ms. Chipowsky's memorandum demonstrates that Ms. Gabrieli did in fact show one of the requests for Ms. Bardsley's records to Dr. Hasiuk. *See* Pl.'s Reply at 3. However, even assuming Dr. Hasiuk did see one or more of the record requests, that does not change Defendants' testimony that they did not expect a lawsuit to be filed. Plaintiff's argument that Defendants' testimony should be disregarded is based on inapposite cases, and is therefore rejected by the Court. *See, e.g.*, *Transamerica Occidental Life Ins. Co. v. Total Sys. Inc.*, 513 F. App'x 246, 249–50 (3d Cir. 2013) (affirming district court's decision to credit numerous pieces of clear and indisputable documentary evidence that contradicted vague deposition testimony of witnesses with second-hand knowledge of relevant facts).

Chipowsky's memorandum also does not resolve the core factual dispute regarding the Defendants' state of mind when completing the application questions at issue.

Third, Plaintiff argues that a statement made during Dr. Hasiuk's deposition in Ms. Bardsley's lawsuit evidences that he expected to be sued by her. This too fails to establish the lack of a genuine factual dispute in this matter. Dr. Hasiuk's statement—that there "would be less of a chance of [a patient] quitting the practice or suing or do[ing] anything negative" if the patient "sees that the person who was involved with the[ir] complication had genuine concern . . . and was trying to help"—is simply too slim a reed to lean a summary judgment ruling upon. (ECF No. 91-5 at 44.) Taken at face value, Dr. Hasiuk did not say he expected Ms. Bardsley to sue him; and when asked whether preventing something "negative" as he described was the motivation behind his visits to Ms. Bardsley in the hospital, Dr. Hasiuk responded: "No. I generally was concerned with her." *Id.*[2]

Plaintiff's fourth and final argument in support of its Motion is that the nature of the injuries to Ms. Bardsley and Ms. Sisco's child should have led Dr. Hasiuk to anticipate future litigation. *See* Pl.'s Br. at 15–16. But there is clearly a factual dispute regarding the conclusions one would be led to draw given Ms. Bardsley's and Ms. Sisco's medical outcomes. As discussed above, as to Ms. Bardsley, the BCWH Defendants were not "concerned . . . because [Dr. Hasiuk] did his follow-up and," in his estimation, "everything was fine." Gabrieli 10/3/2018 Dep. Tr. at 52:22–24. When Dr. Hasiuk was asked at his deposition why he had not been concerned about a potential lawsuit being filed by Ms. Sisco, he explained that her "baby was near death and [he] did an emergency c-section very quickly and [] saved a baby who was ready to die." Hasiuk

---

[2] Even if one were to assume that preventing a lawsuit was the true motivator behind Dr. Hasiuk's concern for Ms. Bardsley, one could just as likely conclude that he then would not have anticipated a future lawsuit *because* of his mitigation tactics.

8

6/29/2018 Dep. Tr. at 108:22–109:8.  Accordingly, Plaintiff cannot rely on the nature of Ms. Bardsley's and Ms. Sisco's medical outcomes to meet its burden of establishing that it is entitled to judgment as a matter of law on a question concerning the BCWH Defendants' state of mind.[3]

IV.     **CONCLUSION**

For all of the foregoing reasons, Plaintiff has not met its burden of establishing the lack of a genuine factual dispute as to whether the BCWH Defendants made a knowingly false representation when completing the relevant insurance application forms.  Plaintiff's Motion for Summary Judgment seeking to void the insurance contracts at issue is therefore denied.

An appropriate Order follows.

BY THE COURT:

/s/ C. Darnell Jones, II
C. Darnell Jones, II    J.

---

[3] The cases cited by Plaintiff only highlight why a grant of summary judgment in its favor would be inappropriate here.  In *Mt. Airy Ins. Co. v. Thomas E. Angst & Assocs., P.C.*, the court found that the legal malpractice insurance applicant must have known of the potential for a future professional liability claim against him, since, during the two years prior to filling out the insurance application, he had misappropriated a total of $148,869.42 of his client's funds, and failed "to comply with the [client's] request for an accounting to justify the disposition of [the] assets."  954 F. Supp. 1040, 1044–45 (E.D. Pa. 1997).  No such intentional illegal acts are at issue in this case.